WALTER M. ELSWICK, Judge.
On the 23rd day of September 1932, the state road commission entered into a contract with claimant, Consolidated Engineering Company, a corporation, for certain excavation, hauling and filling in the construction of what is now known as route No. 2 immediately south of Moundsville in Marshall county, West Virginia, and more particularly designated as Round Bottom hill, Moundsville road, project No. e-184-c. Claimant started work on the project on October 10, 1932 and completed same on November 28, 1934.
*359 The work consisted of excavation, hauling and filling through a rugged, mountainous locality. The surface of the mountainside was irregular and the slope varied. This excavation was made of the mountainside above the Baltimore and Ohio Railroad tracks, which tracks and roadway run parallel with the mountain.
It appears from the evidence that the right-of-way for this road was surveyed in April 1928. At this time the engineers for the state road commission took cross-sections or laid down a base line with stakes approximately fifty feet apart along the ditch line of the railway track. No additional surveys of the topography of the mountainside or slope were made until after the excavations were completed.
The terms of payment for excavation and hauling under the contract were: Unclassified excavation was to be paid for at the rate of 34 cents per cubic yard dug. Overhaul consisting of a measure for each cubic yard per 100 feet hauled a greater distance than 1000 feet was to be paid at a price of one-fourth cent per station yard. Paragraph 12, page 6 of the contract provided that the certificate of estimates of the engineer shall state, from actual measurements, the whole amount of work done by the contractor. Section 74 subsection “a” of the specifications, entitled “basis to pay” provides that the work shall be paid for at the contract unit price per cubic yard of excavation measured in its original position, excavated and deposited in accordance with the specifications.
After the excavations were made the state road commission by its engineers in 1935 undertook to ascertain the amount of excavation by running cross-sections in the cut in accordance with the purported original base line run by the survey in 1928. From the evidence it appears that the usual and customary method to obtain the amount of excavation made is from measurement in the cut based upon the preliminary survey, but from good engineering practice in order to do so in a practical manner in a rugged and irregular country like the one in question it is necessary to survey the topography of tfie surface within a reasonable time before the excavation and to survey the cut within a reasonable time after the excavation is made. *360 From all ihe facts and circumstances in evidence in this .case, it appears that the surveying was not done in that way in this case.
It further appears from the evidence in this case that the original survey made in 1928, nearly five years before the excavation, was inaccurate and insufficient to enable the engineers to use same as a basis of obtaining actual measurements of the whole amount of the work done. For it appears that at the request of the claimant’s representatives the engineers undertook to take cross-sections of the cut at intervals of less than 50 feet on the original base line and it was impossible to make the majority of those taken to close. Some of these cross-sections failed to close with living monuments (record pp. 45-47). For a distance of approximately 8800 lineal feet along the project running from the south to the north between station 437 plus 50 to station 525 plus 50, it appears that at least a total of 478 separate cross-sections were run, and that of this number 312 were so defective in closing with the original surface as taken from the old survey that they were not used in making calculations of the measurement of the excavation. Of the remaining 156 cross-sections used in making calculations 105 or approximately two-thirds of them had errors or discrepancies shown on them. (Record p. 87). It appears that the engineers in calculating the measurements from these 156 cross-sections used undertook to resolve in favor of claimant certain measurements in some of the 105 cross-sections used which had errors and discrepancies. But even then it does not appear that they could arrive at actual measurements of the excavations made, for after they went back for re-checks on these cross-sections it was found that they could not be made to close with the purported survey of 1928 made of the original ground surface. Therefore, not having accurate measurements of the original ground surface immediately prior to the time of the excavations they could not arrive at an actual measurement of the excavation made even though these 156 cross-sections used had been taken at sufficient intervals to calculate measurement of a slope with a regular surface.
Although the excavation was completed on November 28, 1934, final cross-sections were not completed until about April *361 1935. The' engineers in making said final survey after (he work was completed had to use the old survey made in 1928 with stations fifty feet apart. They then endeavored to take cross-sections at closer intervals, at the request of claimant, as close as ten feet or less. Forced to use their old survey with stations. 50 feel apart they interpolated in between to get Ihe original ground surface to be laken in the calculation from the cut surface on the excavated section. This could have; been done more or less successfully if the original survey and final sui vey had been accurate. They were then in position to re-check the final survey of the cut which they did and which was verified. They could not however re-check the original survey for the material had been removed. The interpolated cross-sections were so inaccurate and out of proportion with the survey of the cut as compared with the old survey that they could not. be used. They were of no benefit in arriving at actual measurements of the work done. We can come to no other conclusion than that either the original survey was inaccurate or that there had been a material change in the contour of the hillside by slipping or slides between the time of Ihe original survey and that of the excavation.
The question confronting us upon this inquiry is whether or no! the claimant has been paid for the work done under its contract. The contract provides that this shall be arrived at by actual measurements. We are of the opinion that the claimant has shown by a preponderance of the evidence that the amount of actual excavation done, by measurement of the cut, would not bo an actual measurement, since this cannot be done with any degree of certainly due to the failure of cross-sections of the cut take'll from (he final survey to close with Ihe original survey within (he bounds of tolerance by averages under all engineering practice. And of course it would seem that when 478 cross-sections are first reduced by 312 cross-sections discarded, and, out of the remaining 15(i used. 105 cross-sections had errors or discrepancies, leaving only approximately IF, of those taken to be accurate, the law of averages would become more and more disrupted and out of proportion as a guide' for actual measurements. It appears that lb»re must have been a fundamental error in the original *362 survey of 1928 throughout this area excavated and that same could serve no purpose in the measurements of the cut.
While it is customary (and section 74, subsection “a” of the specifications support the customary practice) to use the actual measurement of the excavation in its original position, in arriving at estimates from these surveys, we do not have data available from which to obtain actual measurements of excavation in its original position. We find from the evidence that cross-section after cross-section on the 8800 lineal feet of excavation, where the bulk of the work was performed, failed to close. There must have been a fundamental error in the original survey or a material change in the topography or contour of the mountainside. The engineer who made the survey in 1928 stated that he took cross-sections at practically every fifty feet and didn’t remember of taking any intermediate sections; that he took such sections every fifty feet “irregardless.” Hence, his testimony doesn’t enlighten us on the question of arriving at actual measurements of excavations dug. However, it is to be borne in mind this was an immense project, probably the largest one of its kind that the state ever considered at the time of the original survey.
Some of the heights of the cut in this excavation ran from a depth of 180 feet. The survey lines ran back in some instances at angles three or four hundred feet from the lower base line to the top of the excavation (record p. 206). In order to make the original survey it was necessary to use rope ladders which were anchored in some way to the steep hillside. The rodman would climb up on these ropes and clinging thereto take measurements. This original survey was completed in thirty days, while it took three months to complete the final survey, which was made after final excavations were completed. From the evidence it appears that this territory involved was steep, rugged with projections, indentations and ravines. It doesn’t appear from the evidence that the original survey was made with the view of using the cross-sections at regular fifty foot intervals as a basis of taking final estimates or measurements on such an immense undertaking as contemplated at that time. It further appears from the evidence that *363 this mountainside from which excavations were made . consisted chiefly of a formation of shale; that this formation when exposed to air and weathering conditions is sub je jet to softening, and in due time crumbles and breaks causing slips and slides on the mountainside. Prior to the time of this excavation the B. & O Railway Company often had to remove large-slides from its tracks coming down from this mountainside. These slides would sometimes overrun its tracks. (Record p. 117). This mountainside continues to have slides and slough-age falling into this cut. There being an interval of from four to eight years from the time that the original survey was made until surveys were made after excavation, we must necessarily conclude from the evidence, considering the nature of this mountainside before and after the excavation that there was a considerable change in the contour or topography of this area excavated so as to affect to a material extent the area through which claimant excavated.
It therefore appears that since we are not in position to say that actual measurements could be taken of the excavations of the material in its original position, it is necessary to look to and consider such other method as may enable us to ascertain as near as possible an estimate of the excavations from actual measurements of other data available. As justification for this procedure we find that the claimant did not know of the inaccuracies of the original survey, and that intermediate cross-sections had not been taken so as to enable the engineers to run cross-sections at closer intervals than regular fifty foot intervals, until after final survey was made and the excavation had been completed. (Record p. 73). Claimant does contend that after it started to work on the excavation, due to the regular slips and slides and change of the contour of the mountainside since the original survey, upon learning that the state road commission was not taking cross-sections in advance of its excavations, requested the inspector of the project and the then state road district engineer to take preliminary cross-sections prior to the excavation. It contends that these state road officials refused to do this and stated that the commission had no appropriation allotted for the purpose. The inspector and district engineer deny that this request was made, but we are of *364 the opinion that since the commission was relying upon the original survey made in 1928 it failed to maintain by a preponderance of the evidence that the old survey was accurate or otherwise furnished accurate and sufficient data upon which to base a final survey to enable them to estimate the actual measurements of excavation removed, and that an accurate survey furnishing data within the bounds of tolerance in making cross-sections close under engineering practice, should have been made available under its contract.
From the evidence it appears that at the request of claimant the engineers of the state road commission took cross-sections of the fill and disposal dump where the material excavated had been hauled and dumped. A survey of all disposal dumps had been made immediately prior to the filling. The final survey was taken after the project was completed, which was in some cases a year or more after the filling had been completed. (Record pp. 49 and 50). The disposal dumps were large in size, covered a lot of territory, and had to be kept in shape for the trucks to haul over them. To do this, a heavy bulldozer was used to pack the fill as the material was dumped. It further appears that after the fills were made there had been two floods in the Ohio river which completely inundated all of the fills. These floods washed out a part of the materials down the river. They also by the very nature of the shale content of the materials caused settlement of the fills before the final survey was made. A shrinkage factor in measuring such fills after a lapse of time and under the conditions involved must necessarily be considered in arriving at an estimate by measurements taken from fills. This particular material deposited in the fills contained what is known as colloids which make for a great deal of aeration in volume, depending upon the extent of moisture and how it is deposited. When it dries out it contracts and shrinks like a mud puddle. Similar material has been known to have had a greater shrinkage than 20 per cent under pressure. (Record p. 121).
The total quantity of excavation as determined from measurements from fill and disposal dump sections as found and submitted to claimant by the engineers of the state road com *365 mission amounted to the sum of 518,890 cubic yards, of which sum 28,285 cubic yards were cast into the Ohio river (and settlement thereon has been adjusted and paid to claimant) leaving 490,605 cubic yards. From all the evidence in the case considering a general shrinkage factor of such material after being rolled and exposed to moisture and air, inundation by two floods and the lapse of time after deposited and before the survey, and all the facts and circumstances of the case, we are of the opinion that a shrinkage factor of approximately 10% should be considered and added to these measurements in order to arrive at a reasonable a ad just conclusion of what the actual measurements would have been of the materials measured in their original position before the excavation.
It appears from the evidence that certain adjustments have heretofore been made in favor of claimant by the state road commission in a partial effort to accomplish this purpose. It appears that numerous calculations made on the cross-sections at the 50 foot intervals which failed to close with the purported original survey, were resolved in favor of the contractor by the road commission engineers in attempting to arrive at their measurement in the cut upon'which basis claimant has been paid. Credits for all such adjustments are considered, but we are of the opinion that these adjustments were not adequate or sufficient to compensate claimant for the work done. They no doubt tended to compensate for yardage at the point of the original 50 foot cross-section when found in error, but would not reveal the amount of actual excavations between such cross-sections on the very rugged and irregular slope in question. The state road commission has paid to claimant the unit price on unclassified excavation and overhaul of 494,999 cubic yards. From the evidence it appears that overhaul would naturally follow by calculation upon the amount of shrinkage found to exist by taking measurements from the fills. After considering all adjustments heretofore made by the commission in making estimates on the basis of measurements taken and crediting the commission with such adjustments made in favor of the claimant, from all the evidence' we are of the opinion that claimant is entitled to an award of *366 nine thousand, seven hundred fifty dollars ($9,750.00) for unclassified excavation and overhaul for which it [the commission] was not paid under the contract. An order will he entered accordingly.